THE STATE OF OHIO, APPELLEE, *v.* KIRALY, APPELLANT.

38

(No. 36008—Decided October 21, 1977.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.

*Mr. Ralph D. Sperli,* for appellant.

Jackson, J. On June 12, 1975, defendant appellant, William Kiraly, and Joseph Gallo, were jointly indicted for the following criminal offenses: attempted aggravated murder in violation of R. C. 2903.01, R. C. 2923.02; aggravated arson in violation of R. C. 2909.02; and conspiracy to commit aggravated murder in violation of R. C. 2923.01. At arraignment defendant Kiraly entered a plea of not guilty.

A jury trial was commenced on November 13, 1975, with defendant Kiraly being tried separately from Joseph Gallo. Defendant was found guilty as charged on the aggravated arson and the conspiracy charges. The charge of attempted aggravated murder was quashed pursuant to R. C. 2941.32. Defendant was sentenced to serve from five to twenty-five years under each charge upon which he was convicted, the sentences to run concurrently.

It is from this judgment and sentence that defendant appeals. The following errors are assigned:

"First Assignment of Error.

"The Court erred as a matter of law and to the prejudice of the appellant in overruling the appellant's *Motion to Suppress Evidence* because the affidavit for the search warrant did not present a substantial basis for the court to find that the information was credible.

"Second Assignment of Error.

"The Court erred as a matter of law and to the prejudice of the appellant in overruling the appellant's *Motion to Suppress Evidence* because the affidavit upon which

the warrant issued contained material false or misleading statements as a result of the affiant's failure to disclose how he obtained hearsay information.

"Third Assignment of Error.

"The trial Court erred as a matter of law and to the prejudice of the appellant by not granting appellant's *Motion for a Mistrial* due to or in the alternative for not instructing the jury to disregard the testimony as to appellant's criminal reputation alleged when the appellant did not testify on his own behalf.

"Fourth Assignment of Error.

"The trial Court erred as a matter of law and to the prejudice of the appellant when it overruled appellant's *Motion for Judgment of Acquital* [*sic*] at the close of the State's case.

"Fifth Assignment of Error.

"The trial Court erred as a matter of law and to the prejudice of the appellant in allowing the State's witness, Tim Thomas, to make an in Court identification of the appellant, that he was not allowed to have the assistance of counsel at the lineup in which that witness identified appellant.

"Sixth Assignment of Error.

"The Court erred as a matter of law and to the prejudice of the appellant by not granting appellant's motion for a mistrial based on appellant's objection to the prosecutor's closing argument.

"Seventh Assignment of Error.

"The Court erred as a matter of law and to the prejudice of the appellant by denying his motion for a new trial.

"Eighth Assignment of Error.

"The trial Court erred as a matter of law and to the prejudice of the appellant by refusing to allow appellant's counsel to contact and obtain statements from jurors as to the effect the newly discovered evidence would have had on them.

"Ninth Assignment of Error.

"The trial Court erred as a matter of law and to the prejudice of the appellant by overruling appellant's *Motion*

*for Judgment* of *Acquital* [*sic*] at the close of appellant's case."

Defendant's fourth and ninth assignments of error, which challenge the sufficiency of the evidence at the close of the state's case and at the close of all the evidence will be considered first.

The record discloses that defendant presented evidence after the trial court denied his motion for acquittal at the close of evidence presented by the state; consequently, he is precluded from challenging the sufficiency of the evidence at the close of the state's case, *State* v. *Larry* (1975), 44 Ohio App. 2d 92. The fourth assignment of error by defendant is not well taken.

The record discloses the following testimony:

At approximately 3:30 or 3:45 on the morning of May 12, 1975, the combination office-residence of Daniel Greene was destroyed by an explosion. At the time of the explosion, the building was occupied by Daniel Greene and Miss Denise Schmidt. The explosion was caused by the detonation of four or five pounds of tetrytol, probably placed on the first floor of the building on the side facing Waterloo Road.

Shortly before the explosion Tim C. Thomas was in front of his house, not far from the residence of Daniel Greene, smoking a cigarette. At that time he observed a green Oldsmobile, with two individuals in the front seat, drive slowly in front of him and proceed toward an alley near the residence of Daniel Greene, where the car stopped briefly. The car then proceeded to turn into Waterloo Road. Mr. Thomas, possibly because he heard a sound, walked to a driveway across the street where he observed a man carrying something behind the residence of Daniel Greene; Mr. Thomas lost sight of the man as the man went into an unlighted area. Mr. Thomas identified defendant as the man he saw behind the residence of Mr. Greene.

A 1974 green Oldsmobile Regency with license number EL 805 was seized by police and searched. This car was leased to Joe Gallo by Jet Auto Leasing. Mr. Thomas

identified this car as the one he had observed near the residence of Daniel Greene shortly before the explosion. Yellow particles were removed from the trunk of this automobile. Analysis of the particles indicated that they were tetrytol. Tetrytol is not available to the general public through lawful means.

Daniel Greene testified that he had seen defendant and Joe Gallo driving slowly in front of his house on May 9 and May 11 in a green Oldsmobile or Buick with license number EL 805, and in two different black Cadillacs on different occasions prior to May 9, 1975. Kevin McTaggert, a friend of Daniel Greene, testified that on May 6, 1975, at 10:30 p. m. he observed a 1973 or 1974 green Oldsmobile with license number EL 805 drive slowly in front of the residence of Daniel Greene, with the headlights off. Two men whom McTaggert was unable to see clearly, were in the car. Mr. McTaggert had observed defendant driving in the area in a black Cadillac on five or six prior occasions.

An FBI agent observed defendant's black Cadillac with license number EL 805 in front of Joseph Gallo's residence at 2 p. m. on May 6, 1975. On May 7, 1975, defendant's black Cadillac was again parked in front of the residence of Joseph Gallo. However, on May 7, 1975, the black Cadillac bore license B 12285, while a green Oldsmobile bore license EL 805. At 7:30 p. m. Gallo and defendant left the area in the Oldsmobile.

The essential elements of the crime of aggravated arson, pursuant to provisions of R. C. 2909.02, are:

"(A) No person, by means of fire or explosion, shall knowingly:

"(1) Create a substantial risk of serious physical harm to any person;

"(2) Cause physical harm to any occupied structure."

There was evidence presented that the occupied residence of Daniel Greene was blown up by the explosive tetrytol. Defendant was seen near the residence shortly before the explosion carrying something. Particles of the explosive were found in the trunk of a car in which de-

fendant had been seen riding and which was seen in the immediate area shortly before the explosion.

We find the above evidence sufficient to support the jury's finding the defendant guilty of aggravated arson.

The provisions of R. C. 2923.01, relating to the crime of conspiracy, provide in part:

"(A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder or murder, kidnapping, compelling prostitution or promoting prostitution, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or a felony offense of unauthorized use of a vehicle, shall do either of the following:

"(1) With another person or persons, plan or aid in planning the commission of any such offense;

"(2) Agree with another person or persons that one or more of them will engage in conduct which facilitates the commission of any such offense.

"(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by him or a person with whom he conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of such character as to manifest a purpose on the part of the actor that the object of the conspiracy should be completed."

The provisions of R. C. 2903.01, relating to the crime of aggravated murder provide the following elements:

"(A) No person shall purposely, and with prior calculation and design, cause the death of another.

"(B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape."

There was evidence adduced at trial that defendant and another person repeatedly drove slowly in the immediate vicinity of the residence of Daniel Greene in the

days and weeks preceding the demolition of the residence. Morever, a car with two occupants who could not be seen clearly, in which defendant and another person had regularly been seen in the neighborhood, and which bore a license plate which had been seen on defendant's own car, was seen near the residence of Daniel Greene shortly before the explosion. As described in the preceding testimony, defendant was seen carrying an object in the yard of Daniel Greene just prior to the explosion.

The demolition of an occupied structure by two individuals is sufficient to indicate agreement to engage in conduct in which the object is purposely to cause the death of any occupants of the structure, and further indicates prior design and calculation.

Upon review of the record, we conclude that the evidence adduced at trial is sufficient to sustain the jury's verdict of guilty of conspiracy.

Therefore, we find the ninth error assigned by defendant to be without merit.

Defendant's first and second assignments of error contend that the trial court erred in overruling the motion by defendant to suppress evidence because of alleged defects in the affidavit for the search warrant. These assigned errors will be considered together.

Warrants may issue only upon a showing of probable cause. *United States* v. *Ventresca* (1965), 380 U. S. 102. In *Spinelli* v. *United States* (1969), 393 U. S. 410, the court, at 419, reviewed the concept of "probable cause":

"* * * In holding as we have done, we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 US 89, 96, 13 L Ed 2d 142, 147, 85 S Ct 223 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 US 300, 311, 18 L Ed 2d 62, 70, 87 S Ct 1056 (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common

sense, United States v. Ventresca, 380 US 102, 108, 13 L Ed 2d 684, 688, 85 S Ct 741 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 US 257, 270-271, 4 L Ed 2d 697, 707, 708, 80 S Ct 725, 78 ALR 2d 233 (1960)."

In *Aguilar* v. *Texas* (1964), 378 U. S. 108, the court states at 111, that:

" 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that these inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' Johnson v. United States * * * at 333 US 13-14, 92 L Ed at 440."

The court goes on to say that the duty of the reviewing court is to determine whether the magistrate performed his "neutral and detached" function, *i. e.*, to determine whether the magistrate drew reasonable inferences from the affidavit. To conclude that a reasonable inference of probable cause was drawn, the affidavit must set forth sufficient underlying circumstances to support the inference of probable cause. Additionally, where the affidavit relies on information supplied by an informant, there must be a basis on which to conclude that the supplied information is credible. *Aguilar, supra; Spinelli, supra; accord, State* v. *Dodson* (1974), 43 Ohio App. 2d 31.

The affidavit on which the challenged search warrant was issued was made by Andrew Vanyo, a member of the Intelligence Unit of the Cleveland Police Department. The defense sought to suppress evidence of particles of the explosive—which particles matched the explosive used in the bombing—found in the trunk of the green Oldsmobile with license EL 805.

The affidavit states in relevant part that:

A. The affiant was involved in the investigation of the bombing of the home of Daniel Greene.

B. The affiant averred that defendant and Joe Gallo

had extensive police records; that defendant and Joe Gallo had dealings with recent victims of gangland slayings and that a note removed from the automobile of one of the victims suggested that Daniel Greene was under surveillance.

C. Investigation by affiant revealed that a green Oldsmobile with license number EL 805 was leased to Joe Gallo, and that a black 1969 Cadillac was owned by defendant.

D. One informant advised that on May 9, 1975, he observed what appeared to be a black Cadillac bearing license EL 805 cruising in the vicinity of the Daniel Greene home. A second informant advised that at approximately 10 p. m. on May 11, 1975, he observed a black Cadillac with license EL 805 stop in front of a tavern several doors from the residence of Danny Greene. A third informant, apparently relating a report from Daniel Greene, advised that on May 7, 1975, an automobile appearing to be a 1973 green Buick with license plate EL 805 was seen driving near the home of Daniel Greene.

E. The affiant stated that FBI agents had under surveillance the black Cadillac of defendant and the green Oldsmobile of Joe Gallo, and that their observations put both Joe Gallo and defendant together in both the Cadillac and Oldsmobile.

We find the above portions of the affidavit to give sufficient underlying circumstances to support a finding of probable cause and consequently to support the issuance of a search warrant. When the criminal background of the defendant and Joe Gallo and their relationship with each other and relationship with victims of gangland slayings, who in turn left evidence of surveillance of Daniel Greene, are coupled with observations of cars belonging to defendant and leased to Joe Gallo being in the immediate vicinity of the residence of Daniel Greene in the days preceding the bombing, there is a common sense basis on which to conclude that incriminating evidence could be found in one of the cars. The credibility of observations by the informants derives from the separate observations in which there apparently was a switching of license

plates, and the related observations by the FBI which put both defendant and Joe Gallo together in both cars.

Defendant's first and second assignments of error are not well taken.

Defendant's third assignment of error argues that the trial court erred by not granting the motion by defendant for mistrial because of certain testimony suggestive of defendant having a criminal reputation, or in the alternative, for not instructing the jury to disregard that testimony. Defendant points specifically to testimony of an FBI agent to the effect that the defendant was under surveillance by the organized crime unit of the FBI and that defendant had nicknames of "Mo" and "The Mechanic" known to the FBI.

In *State* v. *Craven* (1973), 35 Ohio St. 2d 18, the court, citing *State* v. *Doll* (1970), 24 Ohio St. 2d 130, states at 22, that, "[t]he inflamatory effect that results from the introduction of evidence tending to show the commission of another offense by the defendant was recognized as generally so prejudicial as to justify a reversal under the facts of that case." The court held in *Doll* that:

"Evidence is admissible where it is of sufficient force that it logically tends to prove or disprove a fact or issue necessary to a decision in a particular case, unless such evidence is excluded by a rule of law or policy not primarily concerned with the probative force of evidence." Paragraph 3 of the syllabus.

In the present case we do not find the admission by trial court of evidence alleged by appellant to be suggestive of criminal reputation to constitute prejudicial error.

Testimony that an individual was under surveillance and that the individual was known by nicknames to certain agents of the FBI is not unduly suggestive of a criminal reputation in the manner of testimony of prior convictions of the defendant. Recent disclosures about the scope of FBI surveillance suggests that many individuals never convicted of offenses may at times have been under surveillance.

Additionally, testimony that defendant was under surveillance constituted necessary background for testimony

that defendant and Joe Gallo had been observed together prior to the bombing. Testimony that defendant and Joe Gallo were together is relevant to establish agreement, an element of conspiracy. This testimony, therefore, satisfies the test enunciated in *Doll, supra.*

"Conspiracy and common purpose among two or more persons, to commit crime need not be shown by positive evidence but may be inferred from circumstances surrounding the act and from defendant's subsequent conduct.

"Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *State* v. *Pruett* (1971), 28 Ohio App. 2d 29.

The third error assigned by defendant is not well taken.

Defendant's fifth assignment of error contends that the trial court committed prejudicial error in not permitting defendant's counsel to be present at the lineup in which Tim Thomas identified defendant. Defendant does not develop facts to indicate that the lineup was unnecessarily suggestive or conducive to an irreparable mistaken identification. In his appellate brief at page 24, defendant simply claims that "since appellant was denied the right to have his attorney present, there is no way of knowing how prejudicially the lineup was conducted."

Defendant relies on *Kirby* v. *Illinois* (1972), 406 U. S. 682. The Ohio Supreme Court in *State* v. *Sheardon* (1972), 31 Ohio St. 2d 20, cites *Kirby* to set forth the following two-part test with regard to the right to counsel at a pre-trial identification:

"1. The rule of *United States* v. *Wade* (1967), 388 U. S. 218, and *Gilbert* v. *Califoria* (1967), 388 U. S. 263, relative to the Sixth Amendment right to counsel at post-indictment confrontations, does not apply to confrontations conducted before the defendant has been indicted or otherwise formally charged relative to the crime in question. (*Kirby* v. *Illinois* [decided June 7, 1972], U. S. , followed.)

"2. The due process clause of the Fifth and Fourteenth

48

amendments forbids any pre- or post-indictment lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification. (*Kirby* v. *Illinois* [decided June 7, 1972], U. S. , followed.)"

An arrest warrant for defendant was issued on May 16, 1975. Defendant was arrested and bond was set on June 10, 1975. The lineup was conducted on June 11, 1975. Defendant was indicted on June 12, 1975. The challenged lineup was pre-indictment.

Defendant argues, in effect, that since an arrest warrant had been issued and since bond had been set prior to the lineup, that defendant had been "formally charged" despite his not yet being indicted. As a result, defendant urges that defendant had a right to counsel at the lineup. We agree.

It seems clear on this record that at the time of the lineup defendant was "faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law." *Kirby, supra* at 689. By the act of setting bond, we find it implicit that a "formal charge" had been brought.

The court, in *Gilbert* v. *California* (1967), 388 U. S. 263, imposed a *per se* exclusionary rule for testimony of a lineup identification where counsel was improperly prevented from being present. The court states, at 273, "[o]nly a per se exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup." In the present case, the trial court properly refused to allow testimony as to the lineup identification of defendant by Timothy Thomas.

The court, in *United States* v. *Wade* (1967), 388 U. S. 218, considered the question of whether an improper denial of counsel at a lineup would require a *per se* exclusion of an in-court identification. The court declined to impose such a *per se* exclusion noting that the government should first be given an opportunity "to establish by clear and convincing evidence that the in-court identifications

were based upon observations of the suspect other than the lineup identification." *Id.,* at 239, 240.

In determining whether the in-court identification was based upon observations other than the lineup identification, the court found, at 241, that the following factors should be considered, "the prior opportunity to observe the alleged criminal act, the existence of any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

In the present case, under the following analysis of the above factors, we agree with the conclusion by the trial court allowing in-court identification of defendant by Thomas. Thomas testified that he saw defendant for from six to ten seconds, with defendant under a spotlight at a distance of from 45 to 50 feet, and that defendant looked directly at Thomas during that time. In the initial description of defendant given by Thomas, Thomas failed to include hair color, glasses and mustache. Thomas did not identify defendant to police in a photographic array; however, Thomas stated, "* * * I looked at about twenty-five pictures, I think, a bunch of them * * *. I recognized him then, but I didn't say anything * * * I wanted to see the lineup." Later Thomas added that he did not identify the photo because he didn't want to become involved. The lapse of time from the bombing to the lineup was one month.

Prior to the lineup Thomas stated that he was told that defendant might or might not be in the lineup. Thomas was further told that if he did not see the man whom he saw behind the Greene residence to say so and "that would be it." The judge was shown a photo of five men in the lineup besides defendant and concluded that they were of the same size and hair color, although none had

the identical hair style. Defendant showed a very high degree of certainty in the lineup identification. "I am so sure that my hands were shaking" and "I knew him when I first walked through the door."

We agree with the trial court's determination allowing the in-court identification primarily because of the opportunity Thomas had to observe defendant the night of the bombing and because of the apparent regularity, except for the absence of counsel, in the conduct of the lineup itself, coupled with the certainty of the identification by Thomas.

Defendant's fifth assignment of error, is, therefore, without merit.

The sixth assignment of error contends essentially that defendant was denied a fair trial because of alleged error in the closing argument by the prosecution. Defendant claims that the prosecutor improperly referred to defendant as a part of organized crime and improperly characterized him as a "professional hit man" and a "killer."

This court has held that:

"It is a broadly accepted general principle that a prosecution argument outside the record, which influences the jury adversely to the defendant, denies the defendant a fair trial." *State* v. *Watson* (1969), 20 Ohio App. 2d 115, 124.

The prosecution is, however, given some latitude in closing argument. *State* v. *Woodards* (1966), 6 Ohio St. 2d 14. In *Woodards* the closing argument by the prosecution included the following statements:

" '* * * Woodards is a misfit like a gangrenous leg on a diabetic body, like an inflamed, useless appendix that threatens the body, the body and the society of the state of Ohio.

" 'He caused a cruel, unnecessary death. He asks mercy from you. Yet, he showed none.

" 'Remove him from society like you would a parasite. * * *' "

The court found these statements "intemperate"

and indicated that such remarks "might better have been left unsaid," but concluded in part that, "The jury should be given credit for sufficient common sense and sound judgment to discount the remarks made in this case." *Id.*, at 24.

In *United States* v. *Socony-Vacuum Oil Co.* (1940), 310 U. S. 150, the court in finding the closing argument not violative of due process rights noted that the challenged statements, although improper, were relatively isolated instances in a lengthy trial and summation. See generally, 40 L. Ed. 2d 886.

The bulk of the closing argument in the present case was devoted to summarizing the evidence. The prosecution did, however, include comments connecting defendant with organized crime of which there is relatively little evidence in the transcript. While we, under the posture of the evidence herein, are critical of the references by the prosecution to defendant as a "killer" and as a "professional hit man," and although we do not approve of the comments by the prosecution connecting defendant with organized crime without a more substantial evidentiary basis, we find such references to be of the type that a jury would discount, since the overwhelming emphasis of the closing argument is on the evidence and the evidence itself provides a sound basis for the judgment.

The sixth error assigned by defendant is not well taken.

The seventh assignment of error by defendant charges error by the trial court in denying his two motions for a new trial, the first motion being filed January 12, 1976, and the second being filed January 24, 1977. Both motions were premised on newly discovered evidence.

We do not consider the denial by the trial court of the January 24, 1977, motion for new trial for the reason that this motion failed to comply with Criminal Rule 33(B). This rule provides in part that:

"Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered,

or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, *such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period."* (Emphasis added.)

The judgment entry finding defendant guilty was filed December 2, 1975; defendant's second motion for new trial was filed more than 120 days after the verdict. Criminal Rule 33(B) requires that this motion be filed within seven days of an order finding that defendant was unavoidably prevented from finding such evidence within the 120-day period. No such order was filed in the seven days prior to the filing of the motion for new trial. Consequently, defendant's second motion was not properly before the trial court.

Criminal Rule 33(A)(6), relating to grounds for a new trial, provides in part:

"(A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

"* * *

"(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. * * *"

The granting of a motion for a new trial is necessarily committed to the wise discretion of the trial court and a reviewing court cannot reverse that decision unless an abuse of discretion is demonstrated. *State* v. *Williams* (1975), 43 Ohio St. 2d 88; *State* v. *Lopa* (1917), 96 Ohio St. 410.

The following guidelines for granting a motion for a new trial have been enunciated by the Ohio Supreme Court:

"To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence

(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.'' *State* v. *Petro* (1947), 148 Ohio St. 505, and *approved* in *State* v. *Lewis* (1970), 22 Ohio St. 2d 125.

The record reveals that a closed hearing[2] was held by the trial court on January 23, 1976, on the first motion by defendant for a new trial. Defendant urges on appeal that a new trial should have been granted so as to include the testimony of the uncle and the stepfather of the state's eyewitness, Timothy Thomas.

At the hearing the testimony by the stepfather of Timothy Thomas was not damaging to the credibility of Thomas. The stepfather testified that Thomas never told him that he was being paid by Daniel Greene; that Thomas never told him that he had lied; that Thomas had seen two men the night of the bombing; and that he recognized a car on the night of the bombing. The stepfather did say that Thomas had told him that he wanted to work for Daniel Greene.

The uncle of Timothy Thomas testified that Thomas had told him that he [Thomas] was going to be taken care of by Daniel Greene and that he [Thomas] performed two favors for Daniel Greene, one of which was an ''out-and-out lie.'' The uncle testified that he did not know whether or not the "out-and-out lie" had anything to do with the testimony of Thomas at trial.

We are no persuaded that the trial court abused its discretion in denying defendant's motion for a new trial for the following two related reasons. First, the testimony of the uncle of Timothy Thomas would serve only indirectly to impeach the credibility of Thomas, and impeachment

[2]The trial court instructed that those people in the closed hearing not reveal the names of the witnesses.

is typically an inadequate basis for granting a new trial. Secondly, we find this testimony no more destructive to credibility of the prosecution witness than the testimony of David McKinley, who testified at trial that Thomas related to him a somewhat different account of the circumstances surrounding the explosion than Thomas had related at trial. Consequently, the testimony of the uncle of Thomas does not disclose a strong probability that his testimony would change the result as required under the holding in *Petro, supra.*

We find defendant's seventh assignment of error not well taken.

Defendant's eight assignment of error is that the trial court erred in not allowing defendant to contact jurors to obtain statements as to the effect the newly discovered evidence would have had on their decision. Defendant cites no authority that authorizes this procedure.

The standards for granting a new trial on the basis of newly discovered evidence were set forth in *Petro, supra.* These standards do not include a polling of prior jurors. Such a procedure could impose substantial hardships on jurors. *See* Local Rule 22(D), Cuyahoga County Common Pleas.

Consequently, we do not find merit in the eighth error assigned by defendant.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

DAY, C. J., concurs.

KRENZLER, J., concurs in the judgment only.

KRENZLER, J., concurring in the judgment only. I concur in the judgment only. I wish to make some comments, however, with respect to the seventh assignment of error.

The appellant filed two motions for a new trial. The first motion was based on newly discovered evidence and was timely filed on January 12, 1976, within 120 days after the verdict was rendered as required by Criminal Rule 33 (B). The second motion, also based on newly discovered

evidence, was filed on January 24, 1977, nearly 14 months after the trial court's verdict of November 28, 1975.

With respect to the second motion, clarification of the procedural requirements for a motion for new trial on account of newly discovered evidence made after 120 days following the verdict is warranted.

In general, motions for a new trial based on new evidence must be filed within 120 days after the verdict or decision of the trial court. Crim. R. 33(B). Criminal Rule 33(B) permits such motions to be filed after the 120 day time period but establishes as a prerequisite for such late filing a court order finding "by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely." Although the rule does not precisely define the function which the court order serves, it effectively gives the movant an extension of time or judicial leave to file his motion for a new trial.

To obtain the court order containing the finding of unavoidable prevention, the defendant must apply for such an order from the court by motion. Criminal Rule 47 and Criminal Rule 33 establish that it is the defendant's burden to show by clear and convincing proof that he was unavoidably prevented from discovering the new evidence within the 120-day time period. The rule is silent as to the evidentiary material which the defendant must submit to meet his burden of proof but clearly more than mere allegation of unavoidable prevention is required.

Once the court has made the required finding by its order, Criminal Rule 33(B) requires that the defendant's motion for a new trial based on newly discovered evidence be filed within seven days after the order. When filed no later than seven days after the order, the motion for a new trial is properly before the trial court and the provisions of Rule 33 apply to this motion as they would for any other motion for a new trial made on the ground of newly discovered evidence.

It should be noted that the defendant may choose to file his new trial motion together with his motion applying for the court order finding unavoidable prevention.

In any event, however, a motion for new trial on account of newly discovered evidence made after the 120-day time period is not properly before the trial court until the court has entered the requisite order.

The record in this case indicates that on October 27, 1976, eleven months after the jury verdict rendered against him, the appellant filed a motion in the trial court entitled "Application for permission to file affidavits in support of a motion for a trial." The application sets forth the circumstances attendant to the appellant's discovery of an available witness in his behalf and certain other evidence. No affidavits or other material were attached to the motion.

The motion did not request a court order finding that he was unavoidably prevented from timely discovering his new evidence and the appellant did not subsequently apply for such a court order. On January 24, 1977, the appellant filed his second motion for a new trial with certain affidavits attached. By its entry of January 25, 1977, the court granted the motion to file affidavits and denied the motion for a new trial.

The appellant did not expressly request nor receive a court order finding unavoidable prevention and the appellant's motion for permission to file affidavits cannot be deemed a substitute for such a request because it did not include a request for and did not result in the requisite court order.

Therefore, the appellant's second motion for a new trial was not properly before the trial court and could not be considered on its merits. This being so, this court cannot in this appeal consider the merits of the appellant's second motion for a new trial.

Criminal Rule 33 does not place a time restriction upon when motions applying for a court order finding unavoidable prevention may be made. Therefore, the appellant is not precluded from making such application by motion to the trial court at this time, obtaining the required order and filing his second motion for a new trial anew.